**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

Plaintiff,

vs.

**HERMAN E. AGUIRRE,**
a/k/a 007,
a/k/a Lucky,
a/k/a Primo,
a/k/a Freddy,

**TROY R. GILLON,**

Defendants.

Case No. 1:15-cr-143 (LJV)

November 28, 2018

**TRANSCRIPT EXCERPT - TESTIMONY OF LIEUTENANT MARCUS ROGOWSKI**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

JAMES P. KENNEDY, JR.
UNITED STATES ATTORNEY
BY: MEGHAN A. TOKASH, ESQ.
MICHAEL P. FELICETTA, ESQ.
Assistant United States Attorneys
Federal Centre
138 Delaware Avenue
Buffalo, New York 14202
For the Plaintiff

CERULLI, MASSARE & LEMBKE
BY: MATTHEW R. LEMBKE, ESQ.
45 Exchange Boulevard
Suite 925
Rochester, New York 14614
For Herman E. Aguirre

LAW OFFICES OF JASON L. SCHMIDT
BY: JASON L. SCHMIDT, ESQ.
63 Central Avenue
Fredonia, New York 14063
For Troy R. Gillon

PRESENT:

PATRICIA K. PRAWEL, Paralegal
KATHERINE M. REBISZ, Paralegal
DAVID R. TURRI, Special Agent IRS
SHANE A. NASTOFF, Special Agent DEA

LAW CLERK: ALLISON P. GIOIA, ESQ.

DEPUTY CLERK: COLLEEN M. DEMMA

COURT REPORTER: ANN M. SAWYER, FCRR, RPR, CRR,
NYRCR, NYACR, Notary Public
Robert H. Jackson Courthouse
2 Niagara Square
Buffalo, New York 14202
Ann_Sawyer@nywd.uscourts.gov

(Excerpt commenced at 9:51 a.m.)

(Jury present.)

**THE COURT:** So, Mr. Felicetta, call your witness, please.

**MR. FELICETTA:** I'm sorry, Judge. Yes, we'll call Lieutenant Marcus Rogowski.

**M A R C U S  R O G O W S K I**, after being duly called and sworn, testified as follows:

**THE COURT:** You may proceed.

**MR. FELICETTA:** Thank you, Your Honor.

**EXAMINATION BY MR. FELICETTA (DIRECT):**

Q. Good morning, Lieutenant. Can you introduce yourself to the jury and let them know where you work?

A. My name is Marcus Rogowski, I'm a lieutenant for the City of Buffalo Police Department here in Buffalo, New York.

Q. And how long have you worked in the police department in Buffalo?

A. Since 2009.

Q. And you're currently at the rank of lieutenant?

A. Yes, sir.

Q. What are your responsibilities as a lieutenant?

A. I currently am in charge of supervising our community interaction team.

Q. What does that consist of?

A. That role is kind of a public relations job for the City of Buffalo. In that job attending community events, we work on bridging the gap between the police department and the community.
Q. I want to direct your attention to March 23rd, 2015. Were you working that night?
A. Yes, sir.
Q. And in what capacity?
A. I was assigned to patrol to the A District.
Q. And had a call come out in the area of 98 Folger Street that had summoned you to that area?
A. Yes, sir.
Q. First of all, can you describe where Folger Street is situated in the City of Buffalo?
A. Folger Street is located in South Buffalo. It contacts with South Park Avenue and Tifft Street.
Q. And the street is a residential street?
A. Yes, sir.
Q. At the time that the call came out for 98 Folger Street, where were you?
A. I was on patrol in my patrol vehicle on South Park Avenue.
Q. And what was the distance between you and that address?
A. Half a block.
Q. What was the nature of the 911 call?

A. We were dispatched to -- to a call of a family dispute.
Q. When you arrived at the scene, were you the first officer there?
A. Yes, sir.
Q. And were you by yourself?
A. I had a partner with me that day.
Q. Okay. The name of your partner?
A. Lamar Reeves.
Q. So you and Officer Reeves arrived together?
A. Yes, sir.
Q. Can you tell us when you approached the residence was anyone outside?
A. No, sir.
Q. When you approached the residence, did you knock on the door?
A. Yes, sir.
Q. And who was inside? Who did you speak to?
A. Ms. Grigsby and her sister.
Q. I'm sorry?
A. Ms. Grigsby and her sister.
Q. Ms. Grigsby and her sister. Ms. Grigsby, did you later learn to be Shirley Grigsby?
A. Yes, sir.
Q. What was going on between her and her sister at that time?

A. They were having an argument at the dining room table.
Q. Were you physically inside the house at this point?
A. Yes, sir.
Q. Somebody had let you in?
A. Yes, sir.
Q. Were you standing near where they were?
A. Yes, sir.
Q. And what were they arguing about at the time?
A. They were having some words back and forth. There was a duffle bag between them on the table, the duffle bag was the center of the argument.
Q. And did you inquire what the issue was?
A. Yes, sir.
Q. What was the response?
A. Ms. Grigsby's sister pointed to the bag and said that's the problem.

**MR. LEMBKE:** Objection. Hearsay.

**MR. FELICETTA:** It is, Judge. I'm not offering it for the truth of the matter, I'm just trying to lead Lieutenant Rogowski as to the steps that he took based on what he heard.

**THE COURT:** Okay. So -- so you're offering it for his state of mind and why he did what he did after that?

**MR. FELICETTA:** Exactly, Your Honor.

**THE COURT:** Objection is overruled.

And the jurors should understand that the statement is not being -- you should not consider the statement as to whether it's true or not, you should consider it as to what it was actually said to this witness, and therefore was the basis for what he did or didn't do.

So go ahead, Mr. Felicetta.

**BY MR. FELICETTA:**

Q. All right. So you were saying Ms. Grigsby's sister had said something to you about the bag?

A. Yes. She gestured toward the bag and said that's the problem right there.

Q. And you said this was a duffle bag?

A. Yes, sir.

Q. What did you do upon her directing you to that bag?

A. I stepped forward and I opened the top of the bag.

Q. And what did you see inside?

A. Inside I found some plastic packages that had a white powdery material in them.

Q. And upon seeing them, did they look at all familiar to you?

A. Yes, based on my training and experience, I felt that the items in the bag were narcotics.

Q. So what did you do upon making this discovery?

A. Based on the number of narcotics and my perceived danger, I immediately called for additional units to assist me.

Q. All right. Other police officers?
A. Yes, sir.
Q. And did other police officers arrive?
A. Yes, sir.
Q. How long before they arrived?
A. Within minutes.
Q. The other officers, are they patrol officers like you are?
A. Yes, sir.
Q. What about any detectives?
A. Yes. Representatives from the narcotics unit from the City of Buffalo also attended.
Q. And at some point, were other agencies involved in responding to the scene?
A. Yes.
Q. What other agency?
A. Representatives from the District Attorney's Office as well as evidence officers from the City of Buffalo.
Q. All right. Had any other agents from DEA arrived at any point?
A. Not at that time, no.
Q. Okay. Can you describe for the jury what happened after you made this discovery and asked for other police officers to respond?
A. At that point we moved to secure the scene. We moved to

secure the individuals involved. The parties were placed in separate patrol cars and isolated from each other, and we just maintained security of the perimeter.
Q. Beyond Ms. Grigsby and her sister, were there any other occupants of the residence?
A. Yes, it would be a sister's husband.
Q. All right. And you had spoken to him, as well?
A. Yes, sir.
Q. And was he also placed somewhere else?
A. Yes, sir.
Q. Following their being placed in separate areas, was there an attempt made to obtain a consent to search the rest of the remainder of the residence?
A. Yes, there was.
Q. Was that obtained from all three people?
A. Yes, sir.
Q. After obtaining that consent, can you tell us was additional contraband or evidence recovered in that house?
A. Yes. During the subsequent search of the residence, a number of other duffle bags filled with -- based on my training and experience I feel is narcotics was located in the bedroom that was used by Ms. Grigsby.
Q. What was done with all of the contraband or suspected contraband evidence?
A. At that point we assembled a motorcade. We placed the

contraband in one of the evidence detective's vehicles, and we escorted the drugs to our lab in downtown Buffalo.
Q. All right. That's the Erie County CPS lab?
A. Yes, sir.
Q. And did you ride with the motorcade?
A. Yes, sir.
Q. Were all the drugs then brought back into that building?
A. Yes, sir.
Q. Is there an area in that building where the evidence was further examined and documented?
A. Yes, sir.
Q. And what area is that?
A. That's the CPS lab itself.
Q. All right. I'd like to show you some photographs. Was there a police officer who responded to the scene that night?
A. Yes, sir.
Q. And did he capture a number of images that were there at the scene?
A. Yes.
Q. I'd like to show you on the screen --

**MR. FELICETTA:** Can we show for the witness's identification Government Exhibit 80A?

**BY MR. FELICETTA:**

Q. And do you recognize what's depicted in that scene?
A. Yes, that's the exterior of the home at 98 Folger.

Q. 80B.
A. That's the side door of the residence from the driveway.
Q. 80C.
A. That's the view looking into Ms. Grigsby's bedroom from the dining room.
Q. 80G. Excuse me, we'll go to -- yeah, 80G is the next one. Thank you. Do you recognize that?
A. That's the interior of Ms. Grigsby's bedroom and her closet area.
Q. 80I?
A. That's a photo of Ms. Grigsby's boyfriend, Mr. Maulana Lucas.

**MR. LEMBKE:** Objection. Objection.

**MR. FELICETTA:** That's a --

**THE COURT:** Objection, hearsay?

**MR. LEMBKE:** Yes.

**THE COURT:** Or basis of knowledge?

**MR. LEMBKE:** Yeah.

**THE COURT:** So the jury will strike the identify of that person for now.

Go ahead, next question. It's a photograph.

**MR. FELICETTA:** Yeah.

**BY MR. FELICETTA:**

Q. Is that a photograph that was there that night?
A. Yes, sir.

Q. 80J. And where are we at this point?
A. Those pictures are taken inside the interior of the lab of the county police services, those are the bags that were recovered from the scene.
Q. All right. 80M?

**MS. PRAWEL:** M?

**MR. FELICETTA:** Let me make sure. Sorry. Can we go to 80K?

**THE WITNESS:** Those are the contents of the bags that were located inside the house on Folger.

**BY MR. FELICETTA:**

Q. Okay. 80L.
A. Further contents from the bags.
Q. 80M.
A. Again, contents from the bags that were recovered on Folger.
Q. All right. Do all of those photos that we just identified fairly and accurately reflect the scene at Folger Street and at the CPS lab where the evidence was taken on the night of March 23rd, 2015 as it appeared to you?
A. Yes, sir.

**MR. FELICETTA:** Judge, at this time the government is offering 80A through 80C, 80G, and then 80I through and including 80M. I'll note that the other missing photographs are ones that I didn't reference in between have already been

admitted.

**MR. LEMBKE:** No objection from Mr. Aguirre.

**MR. SCHMIDT:** No objection.

**THE COURT:** Okay. They're all received without objection.

**The following were received in Evidence:**

**GOVERNMENT EXHIBIT 80A**

**GOVERNMENT EXHIBIT 80B**

**GOVERNMENT EXHIBIT 80C**

**GOVERNMENT EXHIBIT 80G**

**GOVERNMENT EXHIBIT 80I**

**GOVERNMENT EXHIBIT 80J**

**GOVERNMENT EXHIBIT 80K**

**GOVERNMENT EXHIBIT 80L**

**GOVERNMENT EXHIBIT 80M**

**MR. FELICETTA:** All right. Permission to publish to the jury, Judge?

**THE COURT:** Yes.

**MR. FELICETTA:** Publish 80A.

**BY MR. FELICETTA:**

Q. Lieutenant, can you describe for the jury what's depicted here?

A. Yes, that's the exterior of the house at 98 Folger Street.

Q. All right. And when you approached the residence that

evening, what door did you go to?
A. The door from the driveway into the kitchen.
Q. If we can go to 80B.
A. That is the side door of the entrance to the kitchen from the driveway.
Q. And do you recognize the officer who's standing there?
A. Yes, that's Officer Dennis Kessler.
Q. Let's go to 80C. What are we looking at here?
A. That's the view in Ms. Grigsby's bedroom from the dining room.
Q. All right. So this was the room, this dining room area was the room that you first encountered Ms. Grigsby and her sister?
A. Yes, sir.
Q. Is there a table in this room?
A. Yes, sir.
Q. Where is that table relative to where the photographer is standing?
A. Immediately behind him.
Q. And so from that table looking into that bedroom, that's the room that was identified as Ms. Grigsby's bedroom?
A. Yes, sir.
Q. 80D.
A. That's the interior of Ms. Grigsby's bedroom. The bags of contraband that were located in her closet are seen on the

bed, and the closest area is the open doors to our right.
Q. 80E.
A. That's another up-close view of the bags and the contents of the -- the bags that was located in her bedroom.
Q. 80F.
A. That's another view of the interior of the contraband.
Q. 80G.
A. That's a view inside of Ms. Grigsby's bedroom. The closet area as seen to the right and the bed with the bags of contraband are to the left.
Q. Okay. 80H.
A. That's one of the duffle bags that was located in the bedroom with the contents inside.
Q. 80I, that's a photograph we discussed?
A. Yes, sir.
Q. And that's in the bedroom there?
A. Yes, sir, on the nightstand.
Q. 80J?
A. That's a view from inside the Central Police Services Lab. Those are the bags that were located at Folger.
Q. All right. So after collecting the evidence at Folger Street, you accompanied the bags and the motorcade to this area, and this is inside the forensic laboratory?
A. Yes, sir.
Q. And so there's a number of you present there?

A. Yes.
Q. And who are these bags turned over to?
A. The lab staff.
Q. All right. And so the laboratory staff met you there?
A. Yes.
Q. What time of the evening was this?
A. Approaching 11 p.m.
Q. All right. Lab's closed at this point?
A. Yes.
Q. Did someone come to meet you there from the laboratory?
A. Yes.
Q. And these were the three bags that were taken that contain the contraband?
A. Yes, sir.
Q. Do you recall which of these bags was the one that you initially observed on the dining room table?
A. The one to the right. The blue and black one, actually.
Q. Okay. And so the other two bags were recovered inside the bedroom?
A. Yes, sir.
Q. If we go to 80K.
A. That's the bags and their contents as displayed on a table inside the police lab.
Q. Okay. So that's for each of the bags, the contraband related to each of the bags is put out in front of it?

A. Yes, sir.
Q. 80L.
A. It's another bag and the contents as seen inside the police lab.
Q. 80M.
A. Simply those are the original bricks that were found inside the bag.
Q. Okay. And so did you personally open up any of these wrapped sealed packages?
A. No, sir.
Q. They were all left at the laboratory?
A. Yes, sir.
Q. I'm going to show you some physical exhibits.

**MR. FELICETTA:** May I approach, Judge?

**THE COURT:** Yes.

**BY MR. FELICETTA:**

Q. 91A and 91C have been received in evidence. Do you recognize those exhibits?
A. Yes, I do.
Q. And what do you recognize those to be?
A. Those were the duffle bags that were recovered from 98 Folger Street.
Q. Do you see the one that was present in the dining room when you first arrived on scene?
A. Yes, sir. That's this one here.

Q. Can you just read the exhibit sticker on it?
A. 91A.
Q. Thank you. I'm showing you what's been marked as 91B for identification. Do you recognize this bag?
A. Yes, I do.
Q. And what do you recognize it to be?
A. That was a duffle bag that was recovered from 98 Folger Street.
Q. All right. Does this bear the sticker for the lab number related to this case that you submitted at the lab?
A. Yes, sir.
Q. Other than the sticker being added, does it appear to be substantially in the same condition as when you recovered it on Folger Street?
A. Yes, sir.

**MR. FELICETTA:** Judge, at this time the government is offering 91B into evidence.

**MR. LEMBKE:** No objection from Mr. Aguirre, Your Honor.

**THE COURT:** Go take a look.

**MR. SCHMIDT:** 91B is -- may I -- may I ask some questions, Judge?

**THE COURT:** Sure.

**MR. SCHMIDT:** Mike, just so I understand, the bags here, I want to understand that the bags that are outside the

box, is that part of what's being offered into evidence?

**MS. TOKASH:** They're already in.

**MR. FELICETTA:** These bags are in. 91A and 91C are already in evidence. We're offering 91B, the sticker is on the side here, that's the third bag which had not previously been offered into evidence.

**EXAMINATION BY MR. SCHMIDT (VOIR DIRE):**

Q. When evidence is recovered, there's a -- there's a manner in which the Buffalo Police Department identifies that evidence so that it can track it going forward, is that correct?

A. Yes, sir.

Q. Did you actually transport this? Or was it that the evidence -- the members of the evidence team that recovered this at the scene?

A. The evidence was placed inside an unmarked vehicle operated by Detective Velez of the evidence unit. I then escorted that vehicle to the lab.

Q. And in the condition that it's in now where it's inside a box and the box has at least one label, are any of the markings specific to the Buffalo Police Department?

A. No. It's my understanding that that's a label affixed by the lab, and then the yellow label is affixed by the Court.

Q. So is there any mechanism that that's maintained by the Buffalo Police Department to ensure that what's recovered in

this case at 98 Folger Street is what is eventually brought over to the lab and makes its way into the courtroom today?
A. I don't know if I feel comfortable commenting on everything that happened between when the stuff was taken to the lab until what happened up until this morning.
Q. How do you --

**THE COURT:** I don't think he's asking you that, though.

Ask another question, please, Mr. Schmidt.

**BY MR. SCHMIDT:**

Q. How do you know that what's here today is what was recovered years ago on 98 Folger Street to what you're testifying?
A. My memory.
Q. And your memory is specific as to what? As to this box?
A. No, this morning is the first time I've ever seen that cardboard box.
Q. So before then, it's what were you -- you were shown inside the box which appears to be a camouflage-style duffle bag?
A. That's correct. That's correct.
Q. And other than that, there's no way for you to identify what's in -- what's before you, you're going by the fact that you've been shown by the prosecutor a box containing a camouflage duffle bag?

A. Yes, sir.
Q. And your recollection is that you observed a camouflage duffle bag the night that you responded to the 911 call?
A. Yes, sir.
**MR. SCHMIDT:** On that basis, I'm going to object.
**THE COURT:** Sustained.

**EXAMINATION BY MR. FELICETTA (DIRECT):**

Q. Let me show the witness what's been marked for identification as Government Exhibit 86. Can we scroll into the middle of the document where it lists a series of items? Do you see that description there?
A. Yes, sir.
Q. First of all, this form, are you familiar with this form?
A. Yes, sir.
Q. What is this form?
A. This is the county form. It's a form that is filled out when we submit evidence to the lab and ask that it be tested.
Q. All right. And you were present the night that this evidence was submitted to the laboratory?
A. Yes, sir.
Q. And when you fill out this form, does the Buffalo police, you specifically, or anyone else in the department enumerate each of the items that are submitted to the laboratory?
A. Yes, sir.
Q. And do you enumerate what they look like?

A. Yes, sir.
Q. Do you enumerate where they were found?
A. Yes.
Q. And do you enumerate when they were found?
A. Yes, sir.
Q. Was that done in this case?
A. Yes, sir.
Q. Could you go to the top of the screen? Is there a specific case number that's assigned in the upper right corner from the Buffalo Police Department?
A. Yes, sir.

**MR. LEMBKE:** Objection. Now, this is not in evidence so he can't read from it.

**MR. FELICETTA:** I'm not.

**THE COURT:** He's not asking -- he's asking if there is a number on the form, that's all. You object to that?

**MR. LEMBKE:** No.

**THE COURT:** Okay.

**MR. LEMBKE:** I understand.

**THE COURT:** The objection is overruled.

Mr. Felicetta, next question, please.

**MR. FELICETTA:** All right.

**BY MR. FELICETTA:**

Q. Does that number reflect the number related to the 911 call you had received that night?

**MR. LEMBKE:** Objection.

**THE WITNESS:** Yes.

**MR. LEMBKE:** Now he's basing his testimony off the document which is hearsay.

**THE COURT:** Overruled.

**BY MR. FELICETTA:**

Q. You've had a chance to review the police report in this case?

A. Yes, sir.

Q. All right. So does that number reflect the number related to your 911 call at 98 Folger Street?

A. Yes, sir.

Q. Okay. Then go to the lower right portion of the screen. Now you stated that the lab was closed this night?

A. Yes, sir.

Q. And that laboratory personnel came and opened the lab so they could receive this evidence?

A. Yes, sir.

Q. Is this unusual?

A. Yes, sir.

Q. Is this the nature of what you found that night?

A. Yes.

Q. In the lower right corner when this document is filled out by the Buffalo police, is a lab number assigned by the lab when they receive the evidence?

A. Yes, sir.
Q. And is that number reflected on document number 86 in the lower right corner?
A. Yes, it is.
Q. Beyond the photograph of the exhibit, your own personal memory of the exhibit, does the exhibit bear a sticker that was placed on it by the laboratory that night that reflects the lab number assigned?
A. Yes, it does.
Q. And does it also have a sticker or does that sticker also bear the ID number?
A. Yes, it does.
Q. Now, turning your attention back to Exhibit 86, and zooming into the middle, does the item number correspond with the description of the bag that was submitted by the Buffalo police?
A. Yes, it does.

**MR. FELICETTA:** Judge, we'll offer 91B into evidence.

**MR. SCHMIDT:** Judge, same objection applies. I think the testimony that's elicited from the witness would provide for a chain of custody, I suppose, at best from the lab. The lab had -- well, it's not a chain of custody, but it's identification, there's some symmetry there between what the lab had had and what's here today. But I'm asking specific questions relative to what was recovered that day, and I want

to know, I think Mr. Gillon needs to know that that is exactly what was recovered. And I still haven't heard anything that can tell me. In and ideal world --

**MR. FELICETTA:** I object to the speaking objection.

**THE COURT:** Yeah, you're right.

Did you fill out this form that's on the screen?

**THE WITNESS:** No, sir.

**THE COURT:** Was it filled out in your presence?

**THE WITNESS:** Yes, it was.

**THE COURT:** And did you see it the -- the night that you brought the bags and their contents to the lab?

**THE WITNESS:** Yes, Judge.

**THE COURT:** And is it in the exact same form that it was when you saw it that night?

**THE WITNESS:** Yes, Judge.

**THE COURT:** Okay. The objection is overruled and the exhibit is admitted.

**The following was received in Evidence:**

**GOVERNMENT EXHIBIT 91B**

**MR. FELICETTA:** No further questions. Thank you, Lieutenant.

**THE WITNESS:** Thank you.

**THE COURT:** Mr. Lembke, anything?

**MR. LEMBKE:** No, thank you.

**THE COURT:** Mr. Schmidt, any questions?

**MR. SCHMIDT:** I guess I would just ask briefly.

**EXAMINATION BY MR. SCHMIDT (CROSS):**

Q. You were responding to a 911 call related to a family dispute. 911 indicates that there's an emergency, correct?

A. Yes, sir.

Q. Exigent circumstances.

A. I'm sorry, I don't understand.

Q. I'm sorry, I'll pulled that, just you -- you arrived at the scene and you determined that the two individuals were both healthy and well, but they were engaged in some kind of an argument, right?

A. That's correct.

Q. And then your testimony is that one individual pointed to the bag and said this is what we're arguing over.

A. That's correct.

Q. And then I think your testimony is that as a result of that statement, you then took it upon yourself without obtaining consent at that point to search the bag; is that correct?

**MR. FELICETTA:** Objection, Your Honor.

**THE COURT:** Relevance?

**MR. FELICETTA:** Yes.

**THE COURT:** Sustained.

**BY MR. SCHMIDT:**

Q. But your testimony is, is that as a result of that

statement, you then opened the bag; is that correct?
A. Yes, sir.
Q. I guess just -- you testified that you do have some experience with narcotics, you know, in your profession; is that correct?
A. Yes, sir.
Q. What you saw was -- was, in your view and your based on your training and experience, was narcotics?
A. It would appear to be narcotics, yes.
Q. And can you just tell us what is it specifically about what you observed that -- that -- that led to that conclusion?
A. The brick-like shape, the excessive plastic wrapping.
Q. That was indicative to you of what?
A. What I perceived to be narcotics.
Q. Any way based upon the packaging that you described to determine what -- what form of narcotics we're talking about?
A. It appeared to be a powder.
Q. What was it that appeared to be a powder?
A. The narcotics.
Q. I -- I -- am I correct in understanding that it didn't appear to be a powder, it just appeared to be a brick that was wrapped up in tape and plastic? Or are you saying that you actually saw a powdery substance?
A. Based on my training, based on my experience and from

what I looked at, I felt that it was a powder.
Q. So that I can clarify and understand what you're testifying to, you felt that what was inside was going to be a powdery substance that you equate with narcotics?
A. Excuse me, sorry for interrupting, yes.
Q. And in your -- based on your experience, what kind of narcotics substance did you perceive that it would be?
A. I didn't.
Q. So you didn't know if -- what are the possibilities, I guess is what I'm wondering?
**MR. FELICETTA:** Objection, Your Honor.
**MR. SCHMIDT:** I'm just --
**THE COURT:** Basis?
**MR. FELICETTA:** Relevance.
**THE COURT:** No, overruled. Go ahead.
**BY MR. SCHMIDT:**
Q. What, can you -- I forget my question, I'm sorry.
A. What type of narcotics, I believe was the question.
**THE COURT:** Yeah, what are the possibilities.
**BY MR. SCHMIDT:**
Q. What are the possibilities, you're saying that it's a powdery substance. You're saying that that powdery substance is likely going to be a narcotic, and I'm asking you what -- what -- what kind of narcotic are we talking about?
A. Really, because it could be possibly anything. It could

be heroin. It could be fentanyl. It could be cocaine. It could be any pill turned into a powder. The possibilities are endless.

Q. Okay. And there's no way to distinguish that from the outside of the packaging?

A. No, I have no way to distinguish that.

Q. Okay. Just this type of packaging, the manner in which its wrapped would tell you it's something that's probably illegal?

A. Yes, sir.

Q. Of a narcotic nature?

A. Yes, sir.

**MR. SCHMIDT:** Thank you very much.

**THE WITNESS:** Thank you.

**MR. FELICETTA:** No redirect. No, thank you, Judge.

**THE COURT:** Mr. Lembke, anything?

**MR. LEMBKE:** No, thank you.

**THE COURT:** You may step down. Thank you, sir.

(Witness excused at 10:20 a.m.)

(Excerpt concluded at 10:20 a.m.)

* * * * * * *

CERTIFICATION

I certify that the foregoing is a correct transcription of the proceedings recorded by me in this matter.

s/ Ann M. Sawyer
Ann M. Sawyer, FCRR, RPR, CRR,
NYRCR, NYACR, Notary Public
Official Reporter
U.S.D.C., W.D.N.Y.